**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TINA WELTON,**[1] | ) | **CASE NO. 5:11CV104** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE GREG WHITE** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff Tina Welton ("Welton") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Welton's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq.* This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

**I.  Procedural History**

On September 10, 2007[2], Welton filed an application for SSI alleging a disability onset date of December 1, 2003, claiming that she was disabled due to rheumatoid arthritis, asthma, migraines, emphysema, and depression.  (Tr. 61.)  Her application was denied both initially and upon reconsideration.  Welton timely requested an administrative hearing.

On November 19, 2009, an Administrative Law Judge ("ALJ") held a hearing during which Welton, represented by counsel, testified.  Michael A. Klein, an impartial vocational expert ("VE") also testified.  On March 26, 2010, the ALJ found Welton was able to perform a

---

[1]The record reflects that in approximately 2008, Tina Welton began using her maiden name, James. (Tr. 52, 412, *et seq.*)

[2]August 23, 2007, was the protective filing date.  (Tr. 127.)

significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

### *Personal and Vocational Evidence*

Age 42 at the time her application was filed, Welton is a "younger" person under social security regulations.  *See* 20 C.F.R. § 416.963.  (Tr. 18.).  She has an eleventh-grade education and past relevant work as a punch press operator, package deliverer, and fast food supervisor. *Id*.

### *Medical Facts Pertinent to Digestive Disorder and Chronic Obstructive Pulmonary Disease ("COPD")*

On October 20, 2006, Welton was treated by Marie Kuchynski, M.D., for severe pain attributable to rheumatoid arthritis.  (Tr. 220.)  Dr. Kuchynski reported that she experienced increasing weight loss despite "a good appetite."  *Id*.  Welton, five feet, seven inches (Tr. 29), weighed 106 pounds.  (Tr. 220.)  On May 3, 2007, Welton returned to Dr. Kuchynski complaining of severe muscle pain and seeking an increase in her OxyContin and Soma prescriptions.  (Tr. 218.)  The doctor refused, noting that Welton was already receiving the maximum dose.  *Id*.  At this visit, Welton weighed 118 pounds.  *Id*.

On August 30, 2007, Welton returned to Dr. Kuchynski complaining of severe pain, but upon questioning, Welton admitted that her pain was from menstrual cramps.  (Tr. 217.)  The doctor's notes indicate that Welton complained of  "increasing COPD," as she was unable to walk more than six feet without becoming "very dyspneic."  *Id*.  The doctor further noted, however, that Welton stated she ran out of her Advair prescription months earlier and decided not to continue it as she did not think it was working.  *Id*.  At this visit, she weighed 108 pounds. *Id*.  The doctor also noted that Welton requested to go back on Tagamet as neither Prilosec nor Nexium were effective.  *Id*.  Welton also requested to be put back on Vicodin as Percocet made her itch.  *Id*.  Dr. Kuchynski refused the request for Vicodin, prescribed a Symbicort inhaler and Tagamet, and refilled the Soma and OxyContin prescriptions.  *Id*.

2

On August 31, 2007, Dr. Kuchynski opined in a one sentence letter[3] that Welton was "currently disabled from working due to her rheumatoid arthritis and COPD." (Tr. 237.)

On September 21, 2007, Dr. Kuchynski completed a medical questionnaire for the state disability agency, indicating that she had treated Welton since 2006 for rheumatoid arthritis, migraines, COPD/asthma, and chronic low back pain. (Tr. 214-216.) The doctor noted that Welton's conditions were controlled with medication, but that she still complained of pain. (Tr. 216.) She also indicated that Welton had difficulty lifting, stooping, and bending. *Id*.

On December 3, 2007, Dr. Kuchynski reported that Welton's main complaint was that of abdominal pain. (Tr. 330.) Welton requested that blood work be done as she had not been eating. *Id*. It was noted that Welton weighed 115 pounds. *Id*. The doctor assessed "(1) right upper quadrant abdominal pain rule out cholscystitis. (2) Hyperlipidemia, stable. (3) Rheumatoid arthritis." *Id*.

On January 16, 2008, Dr. Kuchynski noted that Welton tested positive for cocaine and that Welton was to receive no further narcotics from her office. (Tr. 332.)

Between September 6, 2007, and October 7, 2009, Welton was treated numerous times at local emergency rooms. On September 6, 2007, she was seen at the Lodi Community Hospital Emergency Room ("Lodi E.R.") complaining of fever, cough, and difficulty breathing. (Tr. 255-271.) She was given oxygen and medicines to cover "community acquired" pneumonia. (Tr. 256.) Upon reevaluation, Welton still had some wheezing, and was admitted to the hospital for "continued nebulizer treatments and IV fluids." *Id*. A chest x-ray "did not show any definite infiltrate but has features of COPD." (Tr. 261.) The doctor recommended she quit smoking. (Tr. 260.) She was diagnosed with acute exacerbation of chronic bronchitis and rheumatoid arthritis. (Tr. 261.)

On December 4, 2007, Welton presented to Samaritan Regional Hospital Emergency Room ("Samaritan E.R.") complaining of abdominal pain and vomiting. (Tr. 369-380.) She told the admitting nurse that surgery to remove her gallbladder was scheduled for December 17,

---

[3]The letter was addressed "To Whom It May Concern." (Tr. 237.)

2007.[4]  (Tr. 373.)  Welton was diagnosed with abdominal pain and possible gallbladder dysfunction.  (Tr. 376.)

On December 6, 2007, Welton again presented to Samaritan E.R. with abdominal pain. (Tr. 381-390.)  The E.R. doctor assessed the following: "1.  COPD. 2.  Gastrectasis. 3. Prominent colonic fecal material with right colon dilatation or distension. 4. Prominent endometrial cavity at 16 mm. and small free fluid in the left posterior pelvis."  (Tr. 389.)

On January 10, 2008, Welton presented to the Lodi E.R. complaining of chest pain.  (Tr. 333-343.)  A urinalysis drug screen showed the presence of cocaine.  (Tr. 334.)  Welton was unable to explain the positive test results, but claimed she had attended a New Year's party where other people had used the substance.  *Id.*  She was diagnosed with "1. Atypical chest pain. 2. Multisubstance abuse. 3. Chronic obstructive pulmonary disease exacerbation."  (Tr. 335.)

On February 15, 2008, Welton was seen at Samaritan E.R. for pelvic pain.  (Tr. 391-395.) A diagnostic laparoscopy was performed to evaluate her complaints.  (Tr. 392-393.)  The diagnostic impression was pelvic pain, of unknown etiology.  (Tr. 393.)

On February 28, 2008, Welton returned to Samaritan E.R. complaining of abdominal pain and "on and off" chest pain.  (Tr. 397-408.)  The assessment was "[n]o acute cardiopulmonary abnormality.  Moderate prominent diffuse abdominal ileus pattern."  (Tr. 406.)  She was prescribed morphine for pain.  (Tr. 403.)

On August 15, 2008, Welton was transported by ambulance to Lodi E.R. after a drug overdose.  (Tr. 432-450.)  Welton complained of headaches with nausea and vomiting.  (Tr. 438.)  Tests performed on August 18, 2008, show that she continued to experience difficulty breathing.  (Tr. 416.)  Testing indicated COPD.  *Id.*  On August 19, 2008, Welton was discharged with medications and instructions to follow-up with psychiatric care at Appleseed Community Mental Health Center.  (Tr. 440.)

In November, 2008, Welton returned two times to the Samaritan E.R. complaining of abdominal pain with vomiting, diarrhea, and difficulty breathing.  (Tr. 455-464; 465-477.)  The

---

[4]The record does not reflect that gallbladder surgery was performed.

emergency room notes indicated that on November 2, Welton weighed 112 pounds, while at the November 15 visit, she weighed 105 pounds.  (Doc. No. 469, 455.)  She underwent testing and was described as having severe COPD and "bilateral lower lobe patchy consolidations consistent with bibasilar pneumonia."  (Tr. 460.)  The doctor diagnosed gastroenteritis and treated with Phenergan for nausea.  (Tr. 464, 472.)

On December 18, 2008, Welton established a treating relationship with primary care specialist, Jodi Hannan, M.D.  (Tr. 503-505.)  Welton weighed 105 pounds.  (Tr. 503.)  The doctor's assessment was dermatitis, rheumatoid arthritis, amenorrhea, and lumbago.  *Id*.  OxyContin was prescribed.  *Id.*  Welton followed up with Dr. Hannan on January 13, 2009.  At that time she weighed 109 pounds.  (Tr. 499-502.)  Dr. Hannan assessed lumbago (primary encounter diagnosis), hyperlipidemia, pneumonia, and acute peptic ulcers.  (Tr. 500.)  OxyContin was again prescribed.  *Id*.

Dr. Hannan examined Welton twice in March, 2009.  (Tr. 494-497; 497-499.)  On March 12, 2009, Welton weighed 107 pounds.  On March 17, she weighed 101 pounds.[5]  (Tr. 494, 497.)  On May 12, 2009, Welton returned to see Dr. Hannan.  She weighed 113 pounds.  (Tr. 491-493.)  At this visit, Dr. Hannan's notes reflect that Welton had quit smoking five weeks earlier, but continued to experience shortness of breath.  (Tr. 491.)

On July 13, 2009, Mark D. Elderbrock, M.D., examined Welton for complaints of back pain, COPD and arthritis.[6]  (Tr. 547-551.)  She weighed 113 pounds.  (Tr. 547.)  Dr. Elderbrock reported that Welton used oxygen at night to help with COPD symptoms.  *Id*.  He diagnosed chronic low back pain and hyperlipidemia.  (Tr. 548.)  Welton returned to Dr. Elderbrock on October 14, 2009.  At that time she weighed 105 pounds.  (Tr. 543-546.)  Welton complained that she was unable to keep fluids or food down and continued to have diarrhea.  (Tr. 543.)  She

─────────────────────────────

[5]Dr. Hannan's notes indicate that the March 12, 2009, visit was a follow-up after a hospitalization from March 7 - March 9, 2009, for nausea and vomiting.  (Tr. 497.)  Notes from this hospitalization are not in the record.

[6]The record indicates that Dr. Hannan referred Welton to Dr. Elderbrock.  (Tr. 548.)  Both doctors are affiliated with the Cleveland Clinic.

5

told the doctor that she was exposed to the H1N1 through her son. *Id*. Dr. Elderbrock assessed "possible influenza, with persistent nausea/vomiting and dehydration," chronic back pain, and COPD. (Tr. 544.)

### *Physical Residual Functional Capacity ("RFC") Assessment*

On November 27, 2007, Teresita Cruz, a state agency physician, evaluated the record and assessed Welton's RFC. (Tr. 317-324.) Dr. Cruz determined that Welton could lift 20 pounds occasionally and 10 pounds frequently. *Id*. She opined that Welton could sit, stand, and walk with normal breaks for a total of 6 hours in a typical workday. *Id*. She limited Welton to only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 319.) She also felt that Welton should avoid all exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 321.) She found that Welton "remains capable of light exertion." (Tr. 322.) In April, 2008, Nick Albert, M.D., a state agency physician, affirmed Dr. Cruz's assessment. (Tr. 411.)

### *Hearing Testimony*

At the hearing, Welton testified to the following:

- She is 5'7" tall and weighs 92 pounds, although her normal weight is approximately 120 pounds. (Tr. 29.)

- She does not know what causes her weight loss, but generally attributes it to her health. *Id*.

- In January, 2008, she was 98 pounds and then at some point her weight increased to about 120 pounds. *Id*. When she is sick, her weight drops. (Tr. 29-30.)

- She lives with her son and father, who prepare the meals and clean the house. (Tr. 44.) Bleach and her son's cologne affect her pulmonary problem. (Tr. 45.)

- Her most severe medical condition that prevents her from working is her emphysema as she cannot function or breathe ninety percent of the time. (Tr. 33.) Depression also prevents her from working. (Tr. 46.)

- She was prescribed oxygen mid-2008 and now uses it all the time. (Tr. 33.)

- Since August, 2007, she has experienced shortness of breath with activity, such as simply walking across the hall or to her car. (Tr. 34.) She does not, however, experience shortness of breath while under stress. Since approximately mid-2008, she has experienced shortness of breath while lying down. (Tr. 34-35.) She found it helped to elevate her head. *Id*. She spends about 22 hours per day lying down, with her head elevated, watching television. (Tr. 35, 44.)

6

- One of her lungs does not function, while the other functions about 40% of the time. (Tr. 35.)

- Besides oxygen to help relieve COPD symptoms, she uses an inhaler and a nebulizer about four to six times a day. (Tr. 35-36.)

- Prior to quitting six months earlier, she smoked about a pack and a half per day. (Tr. 36.)

- She also experiences constant lower back, knee, lung, and stomach pain. (Tr. 37.)

- She takes Soma, Vicodin, OxyContin, and Nexium. *Id*. She indicated that the Nexium "actually helps a little bit." *Id*.

- She experiences no side effects from the medications. (Tr. 37-38.)

- Her ability to walk is affected by her pain. *Id*.

- She has arthritis in her back and knees. *Id*.

- She gets cortisone shots every three to six months which relieve the pain for about a month. (Tr. 38-39.)

- She has not had back or knee surgery, but has had stomach surgery. (Tr. 39.)

- She has a walker and cane, prescribed by a doctor. (Tr. 40.) She also has a prescription for a motorized chair, but has not purchased one. *Id*. Although she was not using these assistive devices at the hearing, she uses them at home. *Id*. She is embarrassed to use them in public, which is why she does not drive or go anywhere. *Id*.

- After attempting suicide in August, 2008, she began psychiatric counseling at Appleseed. *Id*. She is extremely depressed and sees a psychiatrist once a month and a counselor every couple months. *Id*. She is prescribed Cymbalta, which she thinks "helps a little bit." (Tr. 41-42.)

- She tried cocaine when she was 19-20 years old, but did not like it. (Tr. 42.) She has had no alcohol in over six years. (Tr. 42-43.)

- She can sit for fifteen to twenty minutes at a time. (Tr. 44.)

- She has no outside activities and does not date. (Tr. 45-46.) Her best friend passed away with colon cancer two months before the hearing. (Tr. 45.)

After the VE described Welton's past relevant work as a punch press operator (sedentary, semi-skilled), a package deliverer (light, unskilled), and a fast food supervisor (light, semi-skilled), the ALJ posed the following hypothetical to the VE:

> . . . [h]ypothetical individual, female, 42 years of age, . . . who has a[n] eleventh grade education, and past relevant work as has been characterized for the claimant in this matter. This individual has a history that includes diagnoses of rheumatoid arthritis, COPD and emphysema, peptic ulcer disease, lumbago, upper extremity phlebitis, migraines, fibromyalgia syndrome, gastritis, and, although we have

7

testimony to the contrary today, there has been at least some diagnoses which included substance abuse and major depressive disorder.  This individual's residual functional capacity, for our purposes, will be sedentary with no more than occasional overhead reaching.  Also, no more than moderate exposure to dusts, fumes, strong odors, temperature, or humidity extremes and the last thing, I want to limit this individual to simple, one to two step tasks.  Given those limitations, can such an individual perform any of this claimant's past relevant work either as she performed it or as it is generally performed in the national economy?

(Tr. 53-54.)

The VE testified that such a person could not perform the past relevant work, but, even at a restricted range of unskilled, sedentary work, there would be approximately 8,000 jobs in the State of Ohio and approximately 150,000 jobs nationally that could be done.  (Tr. 54.)  The ALJ asked the VE whether increasing the limitations to include "frequent but less than constant fine handling, grasping, or twisting bilaterally, would that further erode this base at all?"  (Tr. 55.)  The VE responded no.  *Id.*  The ALJ then inquired: "[I]f we took the step to reduce it to no more than occasional fine handling, grasping, or twisting, would that have any adverse effect on this base?"  *Id*.  The VE answered that as to fine dexterity, there would be no change, but occasional grasping and twisting, in addition to the other factors, would preclude employment.  *Id*.

The ALJ next asked the VE:

And independent of that, if this individual were likely to be either absent or leaving the workplace before the normal scheduled departure time and . . . one or the other of these occurrences would be happening minimally three times a month, would there be any significant number of jobs that would conform to the Social Security definition of substantial gainful activity that could tolerate that degree of inattentiveness?

*Id*.  The VE responded no.  *Id*.

### III.  Standard for Disability

A claimant may be entitled to receive SSI benefits when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe

8

impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

The ALJ found Welton established medically determinable, severe impairments, due to chronic obstructive pulmonary disease, lumbago, fibromyalgia, gastritis, and major depressive disorder; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 13-15.)  Welton was found incapable of performing her past work activities, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work.  (Tr. 15.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Welton is not disabled.

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than

9

a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI.  Analysis

### *RFC Determination*

Welton argues that the RFC determination is not supported by substantial evidence. (Doc. No. 15 at 17-20.)  She argues that the ALJ substituted his own opinion for that of Dr. Cruz, the state agency physician, in assessing that she could tolerate moderate exposure to dust, fumes, odors, gases, etc.  (Doc. No. 15 at 18.)  Welton also contends that the ALJ attacked her credibility by focusing on certain statements she made at the hearing. *Id*. at 18-19.  The Commissioner asserts that the ALJ is not bound by findings of State agency medical consultants such as Dr. Cruz.  (Doc. No. 16 at 14-15.)

10

RFC is an indication of an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.945(e).  As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.945(a).

Social Security Regulations require the ALJ to evaluate every medical opinion of record regardless of its source.  *See* 20 C.F.R. § 416.927(d).  The required evaluation focuses on the opinions of treating physicians which are entitled to controlling weight as long as they are (1) well supported by medically acceptable data and (2) not inconsistent with other substantial evidence of record.  20 C.F.R. § 416.927(d)(2); *see Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  When these requirements are not met, the treating physician rule does not apply.  *Id*.

Evidence from non-examining sources is also considered opinion evidence.  20 C.F.R. § 416.927(f).  The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us."  20 C.F.R. § 416.927(f)(2)(ii).

The opinion of a treating physician must be based upon sufficient medical data and detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347–48 (6th Cir. 1993); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* S.S.R. 96–2p).  Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742

11

F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855

(6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. §

416.927(e)(1), the Social Security Commissioner makes the determination whether a claimant

meets the statutory definition of disability.  This necessarily includes a review of all the medical

findings and other evidence that support a medical source's statement that one is disabled.  "A

statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we

will determine that you are disabled." *Id*.  It is the Commissioner who must make the final

decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756

F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

> The ALJ determined Welton's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a).  The claimant is limited to no more than occasional overhead reaching and no more than moderate exposure to dust/fumes/strong odors/temperature or humidity extremes.  The claimant is limited to frequent, but less than constant, fine handling, grasping and/or twisting with the bilateral hands/wrists.  The claimant is limited to simple, one-to-two step tasks.

(Tr. 15.)  In support of this determination, the ALJ analyzed the evidence, including Dr. Cruz's

report, finding as follows:

> Upon review of the medical evidence in November 2007, a state agency consulting physician found the claimant capable of performing light exertional work.  The claimant was limited to occasional climbing (ramps/stairs), stooping, kneeling, crouching, and crawling.  She was limited from all climbing of ladders/ropes/scaffolds and restricted from all exposure to fumes/odors/dusts/gases (Exhibit 8F). * * *

> After considering the totality of the evidence, including the longitudinal medical record and the claimant's testimony, the undersigned finds the state agency assessments generally reflect the evidence of record.  However, the undersigned has accounted for the claimant's subjective allegations, but only to the extent they have some basis in the objective medical record, and the specific location of impairment at the knees, boding against the standing requirement of light exertional positions.

> At the hearing, the claimant identified her most severe impairment as emphysema.  She testified to hardly being able to breath about 90% of the time.  She stated that, if her head is not elevated and she is not still, she cannot breathe.  She reported using oxygen all the time at home.  The claimant acknowledged smoking cessation approximately six months earlier, but indicated her symptoms had not really improved.  The claimant also reported pain in the back, knees, lungs, and stomach.  She denied adverse side effects of medications.  The claimant indicated

she has implemented cortisone shots in the knees and back; she uses a walker and cane at home and has a prescription for a motorized wheelchair. * * *

Although the undersigned has considered the claimant's testimony, it is not fully accepted, as it lacks support in the evidence of record.  The undersigned notes the claimant has reported improvement in shortness of breath ("her usual from smoking") with her cessation of smoking (Exhibit 19F-1).  Examination on May 12, 2009, showed the lungs were clear to auscultation bilaterally and the claimant exhibited no wheezes, rales, or rhonci.  The claimant indicated she was "more able to do activities" (Exhibit 19F-1).  On July 13, 2009, the claimant was noted to only use oxygen at night (contrary to her testimony that she uses in all the time [sic]) (Progress note of Dr. Elderbrock).  When the claimant reported increased shortness of breath on August 30, 2007, she was also noted to have run of out Advair "sometime ago and has not continued it, because she states that she does not think the Advair is working."  Despite her complaints, the claimant exhibited only mild wheezing on examination and Dr. Kuchynski started her on Symbicort.  It is noted that no treating source imposed significant functional limitations related to her breathing complaints and, furthermore, when on medications her level of subjective allegations did not rise to the severity alleged at the hearing.  Thus, while the undersigned finds limits in standing or walking, as well as environmental limits appropriate, the record does not justify limited [sic] greater than those hereby assessed.

* * *

Overall, the undersigned has considered the claimant's complaints of back and shoulder pain in limiting her lifting and reaching/handling/grasping/twisting.  However, the undersigned notes the claimant has consistently exhibited full motor strength and no sensory and/or neurological deficits.  The claimant's back pain has been noted on multiple occasional [sic] to be controlled with medications and the claimant testified to no adverse side effects from medications.

(Tr. 16-17.)  The ALJ reasonably determined that Welton could perform unskilled, sedentary work with restrictions.  He explained that Welton's statements regarding shortness of breath were in conflict with the record as no treating source imposed significant functional limitations related to her COPD symptoms.

Regarding respiratory irritants, Welton argues that the ALJ ignored Dr. Cruz's restriction prohibiting exposure to fumes, odors, dusts, gases, and poor ventilation.  The ALJ's hypothetical moderately limited Welton's exposure to respiratory irritants.  The Commissioner, relying on S.S.R. 96-9p, argues that "few occupations in the unskilled sedentary occupation base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards."  (Doc. No. 16 at 15.)  The ALJ noted that "no treating source imposed significant functional limitations related to her breathing complaints and, furthermore, when on medications her level of subjective allegations did not rise to the severity alleged at the hearing."  (Tr. 16.)

13

The RFC finding that Welton could perform a restricted range of sedentary work, more restrictive than Dr. Cruz's finding of light exertion, is well-supported by the medical evidence. Additionally, the RFC finding is consistent with Welton's own statements about her abilities and limitations. Lastly, the ALJ properly gave little weight to Dr. Kuchynski's letter stating that Welton was "disabled from working" due to her rheumatoid arthritis and COPD, as it is an issue reserved to the Commissioner and it lacked objective support. (Tr. 16-17.)

### Step Three - Listing Requirements

Welton contends that she meets or equals the Listing Requirements for digestive disorders (5.08) and COPD (3.02A). (Doc. No. 15 at 14-17; 20-21.)

Pursuant to step three of the disability evaluation process, the Commissioner must consider whether a claimant's impairments meets or equals any of the relevant listing requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 CFR §§ 404.1520(a), 416.920(a). The burden is on the plaintiff to present evidence establishing that she has a listing level impairment. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). An impairment or combination of impairments is considered medically equivalent to a listed impairment ". . . if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir. 1986) (*per curiam*). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531. Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence. 20 C.F.R. § 404.1526.

The Sixth Circuit has held that a heightened articulation standard is not required of an ALJ at Step 3 of the sequential evaluation process. *See Bledsoe v. Barnhart*, No. 04–4531, 2006 WL 229795, at 411 (6th Cir. Jan. 31, 2006), *citing Dorton v. Heckler*, 789 F.2d 363, 367 (6th

Cir. 1986).  However, *Bledsoe* and *Dorton* make clear that substantial evidence must support the

ALJ's findings and the findings must be legally sufficient and clear.  *Id.*

### Listing 5.08 - Digestive Disorders

Listing 5.00, Digestive Disorders, states, in pertinent part, as follows:

> A. *What kinds of disorders do we consider in the digestive system?*
> Disorders of the digestive system include gastrointestinal hemorrhage, hepatic
> (liver dysfunction, inflammatory bowel disease, short bowel syndrome, and
> malnutrition.  They may also lead to complications, such as obstruction, or be
> accompanied by manifestations in other body systems.

> B. *What documentation do we need?*  We need a record of your medical
> evidence, including clinical and laboratory findings.  The documentation should
> include appropriate medically acceptable imaging studies and reports of
> endoscopy, operations, and pathology, as appropriate to each listing, to document
> the severity and duration of your digestive disorder.  Medically acceptable
> imaging includes, but is not limited to, x-ray imaging, sonography, computerized
> axial tomography (CAT scan), magnetic resonance imaging (MRI), and
> radionuclide scans. * * *

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 5.00A & B.

> Listing 5.08, Weight Loss Due to any Digestive Disorder, states:

> Weight loss due to any digestive disorder despite continuing treatment as
> prescribed, with BMI[7] of less than 17.50 calculated on at least two evaluations at
> least 60 days apart within a consecutive 6–month period.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 5.08.

The ALJ determined that Welton's gastritis was a severe impairment; however, without

analysis, the ALJ found that it did not meet or equal any listing.  (Tr. 13, 15.)  Welton contends

that she satisfied the requirements of Listing 5.08 as she (1) lost weight; (2) had a severe

impairment of gastritis; and, (3) had a history of BMI's of less than 17.50 on at least two

---

[7]The Regulations calculate BMI as follows:

$$\frac{\text{Weight in Pounds}}{\text{(Height in Inches) x (Height in Inches)}} \text{ X } 703$$

20 C.F.R. Pt. 404, Subpt. P, App. 1, §5.00G(2)(b).

15

evaluations at least sixty days apart within a consecutive six-month period.[8] The Court finds that Welton has not presented sufficient evidence to document the claimed severity of her digestive disorder. *See Carlson v. Astrue*, 604 F.3d 589, 593-594 (8th Cir. 2010); *Hopper v. Astrue*, 2010 WL 4609337, *8 (D. Neb. Nov. 4. 2010).

In her application for disability benefits, Welton did not allege that she had a digestive disorder or weight concerns – she alleged rheumatoid arthritis, asthma, migraines, emphysema, and depression. (Tr. 61.) Furthermore, at the hearing Welton attributed her disability to emphysema and depression. (Tr. 46.) Additionally, Welton failed to show that her weight loss resulted from a digestive disorder. The record includes no medical opinions stating that her weight loss was attributable to a digestive disorder. In fact, the record reflects that Welton, while counseling with a psychologist, indicated that she had no digestive problem– she simply was not hungry and did not eat. (Tr. 275. ) Moreover, nothing in the record establishes that Welton's digestive impairment had any impact upon her RFC. As a result, the ALJ reasonably found that Welton's digestive disorder did not meet the requirements of any listing.

Welton also argues that the ALJ should have had the assistance of a medical expert in determining whether her gastric disorder is considered a digestive disorder meeting or equaling Listing 5.08. (Doc. No. 15 at 15, 16, fn. 4 & 5.) Welton, however, cites no rule or regulation that requires an ALJ to order such a review. Under Social Security law, "[t]he burden of providing a ... record ... complete and detailed enough to enable the Secretary to make a disability determination [ ] rests with the claimant." *Landsaw v. Sec 'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986). Moreover, "416.927(f)(2)(iii) provide[s] discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony, stating that ALJs 'may ... ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s)....'" *Simpson v. Comm'r of Soc. Sec.*, 2009 U.S. App. LEXIS 19206 (6th Cir. Aug. 27, 2009) (*citing Davis v. Chater*, 1996 U.S.App. LEXIS 33614, at *6 (6th

---

[8]In footnote four of Welton's brief, she sets forth a chart representing her height, weight and calculated BMIs throughout the relevant time period. (Doc. No. 15 at 15, fn. 4.) She maintains that she met the requirements of Listing 5.08 on November 6, 2007. *Id.* at 16, fn. 4.

Cir. Dec. 19, 1996)); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) *citing* 20 C.F.R. § 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests."); *see also Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").  As such, the ALJ did not commit error by declining to solicit the testimony of a medical expert.

To equal Listing 5.08, a claimant's low weight must be as severe as the listing requirement and must be due to an impairment that is as severe as a gastrointestinal disorder. *See Zebley*, 493 U.S. at 531; *Carlson*, 604 F.3d at 594.  Here, the ALJ summarily found that equivalence was not established.  (Tr. 15.)  S.S.R. 96-6p states that when an ALJ determines that equivalency is not established, the requirement to receive expert opinion evidence into the record may be satisfied by a Disability Determination and Transmittal form or other document that reflects the findings of the consultant and is signed by the consultant.  *Id*. at *3.  In *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974 (8th Cir. 2003), the court concluded that an agency physician gave the requisite opinion on medical equivalence, albeit not explicitly, where the physician stated that an evaluation of RFC was required.  Because no assessment of RFC would have been necessary if the physician had found that the claimant's condition was equivalent to a listed impairment, the court reasoned that the physician implicitly rejected a determination of equivalence.  *Id*. at 978 n. 2.

Welton's records contain a determination letter signed by state medical consultant, Dr. Cruz.  Like the physician in *Jones*, Dr. Cruz concluded that an RFC assessment was necessary, and thus implied that Welton did not equal Listing 5.08.  The ALJ's consideration of Dr. Cruz's signed RFC assessment satisfied the obligation to receive an expert opinion on equivalence.

### *Listing 3.02A – Chronic Pulmonary Insufficiency*

Welton also contends that she meets Listing 3.02A based upon radiographic testing performed on November 15, 2008, showing severe COPD.  (Doc. No. 15 at 20-21.)  The

Commissioner argues that there is no evidence in the record to support that Welton meets or equals Listing 3.02A.

> Listing 3.00A explains:
>
> The listings in this section describe impairments resulting from respiratory disorders based on symptoms, physical signs, laboratory test abnormalities, and response to a regimen of treatment prescribed by a treating source. Respiratory disorders along with any associated impairment(s) must be established by medical evidence. Evidence must be provided in sufficient detail to permit an independent reviewer to evaluate the severity of the impairment.
>
> Many individuals, especially those who have listing-level impairments, will have received the benefit of medically prescribed treatment. Whenever there is evidence of such treatment, the longitudinal clinical record must include a description of the treatment prescribed by the treating source and response in addition to information about the nature and severity of the impairments. It is important to document any prescribed treatment and response, because this medical management may have improved the individual's functional status. The longitudinal record should provide information regarding functional recovery, if any.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00. Furthermore, Listing 3.00E indicates: "pulmonary function studies should not be performed unless the clinical status is stable (*e.g.*, the individual is not having an asthmatic attack or suffering from an acute respiratory infection or other chronic illness).

Listing 3.02A states: "Chronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the person's height without shoes . . ."[9]

Just as he did with the gastritis, the ALJ, at step two, found Welton's COPD to be a severe impairment, but at step three, he summarily concluded that no listings were met or equaled. The Court finds that Welton has not met her burden of establishing that the listing requirements were met or equaled.

Welton contends that radiograph testing performed on November 15, 2008, showed severe chronic obstructive airway disease, establishing that her COPD had worsened. (Doc. No.

_____

[9]The table lists height in inches, without shoes, and the $FEV_1$ values. Specifically regarding Welton, whose height is 67 inches, her $FEV_1$ value is 1.35. Anything equal to or below this number is considered disabled.

18

15 at 20, Tr. 459-460.)  She maintains that the ALJ, using these test results, had a duty to evaluate whether her COPD equaled Listing 3.02.  *Id*. at 20-21.

The Commissioner argues that testing done in November, 2008, was not reliable as Welton had been diagnosed with pneumonia at the time the test was performed.  (Tr. 459-460.) The Commissioner further argues that a spirometry study conducted in 2007 showed values greater than the requirements of the Listing.  Welton's $FEV_1$ results of 1.54 pre-bronchodilators, and 1.56 post-bronchodilators, were well above the listing requirements of 3.02A.

Here, too, Dr. Cruz's RFC assessment, relied upon by the ALJ, implied that Welton did not equal Listing 3.02A.  *See Jones ex rel. Morris*, 315 F.3d at 974.  There is no medical evidence to support that Welton met or equaled the listing during the relevant time period.

In considering the entire record, substantial evidence supports the ALJ's conclusion that Welton's impairments do not meet or equal the requirements of either Listing 5.08 or 3.02A.

### New, Material Evidence

Welton submitted updated pulmonary function testing performed on June 18, 2010, eight months after the hearing and three months after the ALJ's decision.  She argues that this new evidence establishes that she meets the requirements for Listing 3.02A.[10]  Based upon the results of this testing, Welton requests a remand so that the ALJ may consider this evidence with the assistance of a medical expert.  (Doc. No. 15 at 22.)

When the Appeals Council considers new evidence but declines to review the application for disability benefits, that evidence may not be considered as part of the record for purposes of the substantial evidence review.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Comm'r of Soc. Sec*.,  96 F.3d 146, 148 (6th Cir. 1996).  Remand under sentence six of 42 U.S.C. § 405(g) requires that the evidence be both new and material, and that there was good cause for not presenting it in the prior proceeding.  *Foster*, 279 F.3d at 357.  Evidence is "material" for purposes of sentence six remand if it is time-relevant, *i.e.*, either relates to the period on or

---

[10]On June 18, 2010, Welton underwent a pulmonary function test, resulting as follows: Pre-bronchodilator $FEV_1$ level = 1.08; Post-bronchodilator $FEV_1$ = 1.24 (Tr. 574), which fall below the table listing of 1.35.

before the date the ALJ rendered his decision.  *See, e.g., Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003) (Remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative proceedings.)  Also, evidence is "material" only if there is a reasonable probability that the ALJ would have reached a different conclusion if the evidence had been considered.  *Foster*, 279 F.3d at 358.  Here, the new evidence does not relate to the relevant time period before the denial of benefits and, therefore, it is not material.  The evidence fails to meet the criteria for a sentence six remand.  A remedy remains, however, as Welton may initiate a new claim for benefits if her condition has indeed changed.  *See Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

### VII.  Decision

        For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner is affirmed and judgment is entered in favor of the defendant.


                                                    s/ Greg White_____
                                                    United States Magistrate Judge

Date:    January 9, 2012

20